## ALCOA S. S. CO., Inc., et al. v. McMAHON et al.

United States District Court
S. D. New York.

Nov. 5, 1948.

Lord, Day & Lord, of New York City, for plaintiff Cunard White Star, Limited.

Kirlin Campbell Hickox & Keating, of New York City, for plaintiffs.

Jacob Fischer, of New York City, for defendants.

RIFKIND, District Judge.

Collective bargaining is the legislatively established labor policy of the United States. That policy was expressed in the Norris-LaGuardia Act, 47 Stat. 70, 29 U.S.C.A. § 101 et seq., in the Wagner Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq., and in the Taft-Hartley Act, 61 Stat. 136, 29 U.S.C.A. § 141 et seq. Basic to the success of such a policy is responsible self discipline on the part of those who are collectively represented in such bargaining. If collectively bargained agreements are mere pious hopes which do not in fact govern the conduct of employees and employers, then the whole system of orderly, democratic unionism will in course of time be acknowledged a failure. The inevitable result of such a development will be to confront us with a choice of one of three evils: industrial anarchy; a return to that unequal and inequitable system when the employment agreement was the product of private negotiation between the powerless employee and the all-powerful employer; or an authoritarian subjugation of both employers and employees.

To put it simply, a union which will not secure acquiescence on part of the minority of its members in the views of its majority as expressed in a duly accepted union agreement with the employer exhibits less than the required measure of fortitude and self discipline which the employer has the right to expect when he "recognizes" the union as bargaining representative. The minority which reduces the union to such a state of impotence is in reality sabotaging the union and sapping the bargaining power of the majority as well as of the

minority of the employees. There is no hope of peaceable progress for the wage earner in such a self-defeating and suicidal policy. Scholars in the field of labor relations are coming to regard the labor agreement, collectively negotiated, as the constitution for the civilized regulation of the industry affected, Chamberlain, 1948, 48 Col.L.Rev. 829. It is simple wisdom that constitutions do not thrive on nullification.

These observations are prompted by the petition of a number of employers of longshoremen in the Port of New York, filed pursuant to Title 28, § 400(2) now codified in 28 U.S.C.A. § 2202. The facts are simple enough.

A collectively bargained agreement is in effect between the longshoremen, represented by the International Longshoremen's Association, and their employers. The construction of one of its provisions having come into question, it was resolved in an action for a declaratory judgment by a decree which adjudicated that, under the agreement, the employers had the right to assign more than eight men, out of a gang of twenty, for work inside the hold of a vessel in loading or unloading operations.

Despite the provision of the agreement, notwithstanding the adjudication and in defiance·of the instructions of union officers, a number of the members of three locals subject to the agreement have refused to abide by their obligations thereunder. Respondents do not deny the facts of the petition nor oppose an injunction if one may issue.

To load or unload general hold cargo a "gang" of twenty men has traditionally been employed, distributed about the hold, deck, and pier. New methods have however been developed under which the number of men to be stationed in each place for efficient operation varies with the nature of the cargo and the apparatus of discharge. To achieve the economies of the new method a proper distribution of manpower is required. The effect of insisting, as the recalcitrant longshoremen here insist, on an eight-four-eight distribution among hold, deck, and pier at all times, is on the one hand greatly to prolong the duration of the operations and on the other

to leave a portion of the "gang" standing idle on deck or pier because the men in the hold are too few to handle cargo rapidly. That economic waste results both immediately and prospectively in blocking the adoption of improved instruments and techniques is self-evident.

The petition asks for injunctive relief in aid of the declaratory judgment. The precise character of the relief requested, as modified upon the argument, is as follows:

That an injunction issue

1. restraining the union officials from ratifying such disobedience on the part of the members;

2. restraining the individual members from refusing, so long as they are in the plaintiffs' employ, to obey the direction to work as directed;

3. restraining the union from receiving the dues of the recalcitrant members and conferring upon them any union benefits;

4. restraining the recalcitrant members from working in the longshore industry anywhere in the Port of New York for so long as they continue to disobey.

■ The problem is urgent. Its social and industrial implications evoke a keen desire on the part of at least one judge to be the architect of a successful solution. Reluctantly I have concluded that federal judicial action is precluded. The Norris-LaGuardia Act provides, Title 29 U.S.C.A. § 104:

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment; * * *

"(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value; * * *

"(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

"(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title."

That this is a labor dispute, a disagreement over the terms and conditions of the longshoremen's employment, is indisputable.[1] Equally indisputable is it that the requested relief is barred by the express restrictions of the Act. Consequently, the relief sought cannot be granted unless the Taft-Hartley Act has changed the rules. I do not think that it has.

The problem of enforcing union agreements is as old as the agreements themselves. After prolonged study, the Congress, in the Labor Management Relations Act, 1947, 29 U.S.C.A. § 141 et seq., sought to provide some deterrent against breach of such agreements, more effective than the available, procedurally complex and unrewarding state court proceedings. See Sen. Rep. No. 104, 80th Cong., 1st Sess., 1947, p. 15. The Act authorized suit in the United States district courts for violation of contracts between an employer and a labor organization "representing employees in an industry affecting commerce." 29 U.S.C.A. § 185. But Congress did not, in conferring such jurisdiction, expressly withdraw the restrictions of the Norris-LaGuardia Act. Rather, the Senate Report acknowleged that the Norris-LaGuardia Act and many state statutes modeled upon it barred injunctive relief for the enforcement of such agreements. Sen.Rep. No. 105, supra, p. 17; see International Longshoremen's and Warehousemen's Union v. Sunset Line & Twine Co., D.C. N.D. Cal. 1948, 77 F.Supp. 119, 122. Nor can it be implied that Congress intended that the jurisdiction conferred by § 185 should be free of the Norris-LaGuardia Act. In other instances in the same Act, where Congress so intended, it expressly lifted the bar of the Norris-LaGuardia Act. Illustrative are §§ 186, 178. This conclusion is buttressed by the legislative history of the Taft-Hartley Act. The Senate bill, S. 1126, 80th Cong., 1st Sess., 1947, made violation of a collective bargaining agreement an unfair labor practice, subject to injunction as such; § 8(b) (5), § 8(a)(6), S. 1126, 80th Cong., 1st Sess., introduced April 17, 1947. This provision was deleted before final passage. Both the Senate bill and the House bill, H.R. 3020, 80th Cong., 1st Sess., 1947, authorized suits for breach of collective bargaining agreements to be brought in the federal courts, and the House bill specifically provided that the Norris-LaGuardia Act be inapplicable to such suits; § 302(e), H.R. 3020, supra. This provision too was deleted before final adoption of the measure. See Conference Committee Report, Labor Management Relations Bill, 1947, H.R. 3020, 80th Cong., 1st Sess., June 3, 1947.

To the extent that Communication Workers v. Telephone Co., D.Colo. 1948, —— F.

---

[1] "When used in sections 101–115 of this title, and for the purposes of such sections—

"(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interest in a 'labor dispute' (as defined in this section) of 'persons participating or interested' therein (as defined in this section).

"(b) * * *

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 47 Stat. 73, 29 U.S. C.A. § 113.

Supp. —— is inconsistent with these views, I am unable to agree with it.

Whatever state policy may be,[2] it is not yet the policy of the United States judicially to compel obedience to collective bargaining agreements on pain of imprisonment.

■ There is yet another aspect to this problem which operates to defeat the petition. No matter how it is phrased, a basic ingredient of the decision must be that the courts are not suitable instruments for maintaining internal discipline inside a workshop. For breach of a contract of employment by an employee, the employer generally and under the employment agreement herein involved specifically has the remedy within his own hands, the remedy of dismissal or discharge. Merely because in this case there has been an adjudication concerning the meaning and effect of the agreement and a declaratory judgment thereon entered does not entitle the employer to acquire as an additional instrument of enforcement the remedy of punishment for contempt of an injunctive decree. The only ostensible precedent cited for the relief herein demanded is Southern California Ry. Co. v. Rutherford, C.C.S.D. Cal. 1894, 62 F. 796. Suffice it to say that too much water has gone under the bridge to entitle that decision to application at the present time.

Petition denied.

---

[2] The policy of the State of New York may well be otherwise, since its statute specifically excepts threatened breach of contract from the general excision of jurisdiction to issue injunctions in labor disputes. N.Y.C.P.A. § 876-a; Nevins, Inc., v. Kasmach, 1938, 279 N.Y. 323, 18 N.E.2d 294.