382 Pa. 326 (1955)
Philadelphia Marine Trade Association
v.
International Longshoremen's Association, Local Union No. 1291, Appellant.
Supreme Court of Pennsylvania.
Argued April 21, 1955.
June 27, 1955.
*327 Before STERN, C.J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.
Abraham E. Freedman, with him Freedman, Landy & Lorry, for appellants.
Owen B. Rhoads, with him Raymond W. Midgett, Jr., Robert M. Landis, and Barnes, Dechert, Price, Meyers & Rhoads, for The National Sugar Refining Company, appellee.
*328 Francis A. Scanlan, with him Robert G. Kelly and Kelly, Deasey & Scanlan, for Philadelphia Marine Association, appellee.
Thomas F. Mount, with him Rawle & Henderson, for Dugan & McNamara, Inc., appellee.
ORDER PER CURIAM, April 27, 1955:
And now, to wit, April 27, 1955, a majority of the Court being of opinion that the controversy between the parties must be settled by the arbitration provisions in Sections 28 and 29 of the Agreement between the Philadelphia Marine Trade Association and the International Longshoremen's Association for the Port of Philadelphia and Vicinity entered into the 12th day of March, 1954, the orders of the court below of March 23rd and March 25th, 1955, are affirmed; opinions to be filed later. Costs to abide the event.
OPINION BY MR. CHIEF JUSTICE HORACE STERN, June 27, 1955:
Shortly after the argument on this appeal and because of the urgent need for a prompt decision we entered an order affirming the grant and the continuance of a preliminary injunction by the court below. This opinion is written in support of the decision thus rendered.
Philadelphia Marine Trade Association is a nonprofit corporation comprising in its membership steamship lines, steamship agents, stevedoring companies, tugboat and barge companies, marine terminal operators, warehouses and companies rendering other services in and to the marine industry in and about the Port of Philadelphia. On March 12, 1954, as collective *329 bargaining agent for those of its members who employ longshoremen, it entered into an agreement with the International Longshoremen's Association for the Port of Philadelphia and Vicinity and its affiliated Locals 1290, 1291, 1332, 1566 and 1694, as collective bargaining agent for deep-sea longshoremen in the Port of Philadelphia. The agreement, which was to be in effect until September 30, 1955, contained various provisions in regard to the loading and unloading of ocean-going ships in the Port of Philadelphia and vicinity. One of its obvious purposes was to prevent work stoppages, a joint sub-committee of the parties being established to make recommendations for that purpose.
In February, 1955, the National Sugar Refining Company, which is a member of the Philadelphia Marine Trade Association and owns and operates a pier on the Delaware River where ocean-going vessels berth for the purpose of discharging raw sugar to be refined at its refinery, contemplated putting into operation at its pier certain improved unloading facilities known as a monorail system. This innovation apparently involved the displacement of a number of longshoremen engaged in the handling of the cargoes of sugar, but Local 1291 did not concede that such a result necessarily followed. The question of the number of men to be employed at the pier upon the installation of the new system thus became a matter of controversy between the Trade Association and the Union.
The collective bargaining agreement between the parties provided (Paragraph 11(d)) as follows: "Nothing herein contained shall be construed as warranting a demand on the part of the union to change established methods of operation or to change the number of men heretofore employed in gangs, providing that a committee of three representatives of the union and three representatives of the employers shall immediately *330 following the execution of this agreement hold meetings for the purpose of reaching an agreement upon the number of men on certain commodities where disputes regarding the number of men may exist. In the event that technological advancements in machinery or methods in the future are introduced by the employers, the number of men thenceforth to be employed for handling the particular commodities shall be the subject of negotiation between the sub-committee [sic] herein created."
Pursuant to this provision each of the parties designated three representatives to act on such a committee, but, after holding several meetings, the committee was unable to reach an agreement and the question then naturally arose as to what was to be done in view of the impasse.
Paragraph 28 of the agreement provided as follows: "All disputes and grievances of any kind or nature whatsoever arising under the terms or conditions of this agreement, and all questions involving the interpretation of this agreement, shall be referred to a Grievance Committee which shall consist of two members selected by the employer and two members selected by the Union. Should the Grievance Committee be unable to resolve the issue submitted, they shall immediately refer the matter to the Rev. Dennis J. Comey, S.J., as Impartial Arbitrator. The Impartial Arbitrator shall have unlimited authority in resolving any issues submitted to him, and shall likewise have unlimited authority to establish his own rules of procedure provided that he shall have no authority to change any of the terms or conditions of this agreement. Should it become necessary at any time during the effective period of this agreement to select a successor to the Impartial Arbitrator herein named, he shall be selected by agreement of the parties hereto and any *331 such successor shall have all of the powers and authority granted to the Impartial Arbitrator named herein."
Paragraph 29 provided: "No Steamship Company or Contracting Stevedore and no official, District Council or Local of the International Longshoremen's Association shall make any change in this agreement nor render any interpretation of any provision thereof which shall be binding on any of the parties hereto. A difference of opinion regarding the meaning of any provisions of this agreement, which cannot be amicably adjusted between the parties, shall be determined only by an Arbitration Committee appointed in accordance with Clause 28."
A definite proposal was made by the Trade Association for the settlement of the controversy but the Union rejected it. The Trade Association then called upon the Union to join in the submission of the matter to arbitration in accordance with the provisions of Paragraph 28, but the Union took the position that Paragraph 11(d) was not subject to the arbitration procedure prescribed by Paragraph 28 and refused to appoint representatives to serve on a Grievance Committee as therein provided. The Sugar Refining Company put the new operation into effect, reducing the number of men employed from some 160 to 108, whereupon the longshoremen refused to work at the pier unless as many of them were employed as before the new system was installed. The present action was then instituted by the Trade Association, the Sugar Refining Company and Dugan & McNamara, Inc., the last named being the contractor which furnishes all stevedoring services to the Sugar Refining Company at its pier and is the employer of the longshoremen here involved. The defendants named in the action were the Local Union No. 1291, certain of its officers and officials, and the 160 longshoremen employed by Dugan & McNamara, *332 Inc. who had stopped work. Plaintiffs prayed for an injunction restraining the Union from violating the collective bargaining agreement, from failing and refusing to participate in the arbitration procedures prescribed by the agreement, from committing any action in violation of the no work-stoppage agreement, and from refusing to supply longshoremen to Dugan & McNamara, Inc. for stevedoring services at the pier. As a result of the work stoppage Dugan & McNamara, Inc. was prevented from fulfilling its contract with the Sugar Refining Company, all unloading of sugar cargoes ceased, and great numbers of the Company's employes were thrown out of employment. The court, on affidavits, issued a preliminary injunction as prayed for, and subsequently, after a hearing, continued the injunction until final hearing. From that order defendants filed the present appeal.
The Labor Anti-Injunction Act of June 2, 1937, P.L. 1198, § 4, as amended by the Act of June 9, 1939, P.L. 302, provides that it should not apply in any case involving a labor dispute which was in disregard, breach or violation of, or which tended to procure the disregard, breach or violation of, a valid subsisting labor agreement, arrived at between an employer and the representatives designated or selected by the employes for the purpose of collective bargaining.
Defendants present several questions for determination, one of which challenges the jurisdiction of the court below on the ground that plaintiffs' complaints are cognizable only in a Federal and not a State court. This contention is specifically answered by the decision of this court in General Building Contractors' Association v. Local Union No. 542, 370 Pa. 73, 87 A. 2d 250 (cited with approval in Garner v. Teamsters, Chauffeurs and Helpers, Local Union No. 776, 373 Pa. 19, 25, 94 A. 2d 893, 897). In that case we upheld the *333 granting of an injunction which enjoined the violation of a collective bargaining agreement by a labor union. It was there argued that Congress, by enactment of the Labor-Management Relations Act of 1947, had taken from the State courts the jurisdiction to issue such an injunction, but we held that neither that Act nor any other Federal legislation deprived the State courts of their inherent equity powers for the enforcement of contracts. We pointed out that Section 301 of the Labor-Management Relations Act, giving jurisdiction to District Courts of the United States of suits for violation of contracts between an employer and a labor organization representing employes in an industry affecting commerce, did not indicate that such jurisdiction was to be exclusive; moreover, it applied only to suits for the recovery of damages, not for injunctive relief, the right to grant which had been denied to such courts by the Norris-LaGuardia Act of 1932. We said (p. 82, A. 2d 255): "There does not exist any repugnance or conflict, direct or indirect, between the exercise of jurisdiction by a court of equity as in the instant case and the Labor Management Relations Act and the Norris-LaGuardia Act. There are no statutes which would curtail the exercise of jurisdiction by the Court in the circumstances here presented. Prevention of violation of obligations contained in a contract by injunctive relief is a power traditionally exercised by courts of this Commonwealth. Congress has not acted upon the specific subject matter at issue. Enforcement of contracts may be required according to the usual processes of the law."
That State courts retain the jurisdiction they have always had to enforce contracts notwithstanding Section 301 of the Labor-Management Relations Act has been held in several Federal cases: Castle & Cooke Terminals, Ltd. v. Local 137 of International Longshoremen's *334 and Warehousemen's Union, 110 F. Supp. 247; Associated Telephone Co., Ltd. v. Communication Workers of America, C.I.O., 114 F. Supp. 334. In regard to that Act it was pointed out in Alcoa Steamship Company, Inc. v. McMahon, 81 F. Supp. 541, 543, that the Senate Bill made violation of a collective bargaining agreement an unfair labor practice subject to injunction as such, but this provision was deleted before final passage, while the House Bill specifically provided that the Norris-LaGuardia Act should be inapplicable to suits for breach of collective bargaining agreements brought in the Federal courts, but that provision too was deleted before final adoption of the measure. In fact the Congressional conference committee report on the Labor-Management Relations Act, in referring to the deletion in the Senate bill above mentioned, stated that "Once parties have made a collective bargaining contract the enforcement of that contract should be left to the usual processes of the law and not to the National Labor Relations Board." It may be added that the day after the present action was instituted defendants removed the proceedings to the United States District Court for the Eastern District of Pennsylvania but that court promptly remanded the proceedings to the State court upon the ground that the Federal court had no jurisdiction. Defendants, now seeking further grounds for ousting the jurisdiction of the State court, claim that the case involves a matter of unfair labor practices and also a jurisdictional dispute between rival labor unions, but the present record furnishes no support whatever for either of those contentions.
This brings us to the principal question in the case, namely, whether the controversy between the parties as to the number of men to be employed in connection with the operation of the monorail system is a matter *335 referable to arbitration under Paragraph 28 of the collective bargaining agreement. Both parties admit that under Paragraph 11(d) the number of men to be employed in view of the adoption of the new technological advancement in machinery or method was a subject for negotiation by the committee provided for in the agreement, and such negotiations were in fact entered upon, but, notwithstanding protracted discussions, no agreement could be reached. Of course no governmental authority, whether executive or judicial, has the power to compel negotiators to come to an agreement. Was the problem then to remain unsolvable? Obviously not, for in such situations recourse must ultimately be had to some tribunal having the power to decide the issue, either a court or a body selected by the parties themselves. In the present case the collective bargaining agreement established such a tribunal, for Paragraph 28 provided that all disputes and grievances of any kind or nature whatsoever arising under the agreement should be referred to a Grievance Committee, and, if that body should prove unable to resolve the issue submitted, they should immediately refer the matter to an Impartial Arbitrator therein named. Nothing could be clearer, therefore, than that, negotiations having failed under Paragraph 11(d), the dispute had to be referred to the arbitration machinery set up in Paragraph 28. Defendants point to cases such as Henry v. Lehigh Valley Coal Co., 215 Pa. 448, 64 A. 635, and B. Fernandez and Hnos., S. en C. v. Rickert Rice Mills, Inc., 119 F. 2d 809, holding in effect that where there are two clauses in an agreement, one providing for a special tribunal to settle a special subject or dispute, and the other a general clause providing that any differences between the parties should be referred to arbitration, the latter clause cannot be held to cover the special subject provided for in the former clause for *336 which a different and special tribunal was provided. What defendants overlook, however, is that the tribunals there set up were each to be independent and final, whereas here the arbitration procedure was to come into operation only after the deliberations of the negotiating committee proved ineffective and failed to settle the controversy. Moreover, we are of opinion that the provision in the agreement requiring arbitration under the circumstances here present is so clear that the question as to whether the dispute between the parties is subject to such arbitration does not itself constitute an arbitrable issue. The construction of a contract to determine what questions the parties have agreed therein to submit to arbitration is one, not for the arbitrators themselves, but for the court to decide, and the court will not readily infer that it was intended to empower the arbitrators to determine the extent of their own jurisdiction: International Association of Machinists v. Cutler-Hammer, Inc., 67 N.Y.S. 317 (affirmed 297 N.Y. 519, 74 N.E. 2d 464); B. Fernandez & Hnos., S. en C. v. Rickert Rice Mills, Inc., 119 F. 2d 809, 814, 815.
Defendants complain that the court refused to admit evidence designed to show that plaintiffs had violated the agreement on former occasions, but such evidence would clearly have been irrelevant in view of the fact that the agreement admittedly had continued in full force and effect down to the time of the occurrences giving rise to the present litigation. Defendants contend that relief should not have been granted to plaintiffs because only one of them, Dugan & McNamara, Inc., was the employer of the longshoremen, but Philadelphia Marine Trade Association was a party to the collective bargaining agreement and is asserting its rights thereunder, and, while the National Sugar Refining Company was neither such a party nor an *337 employer, it suffered great damage by reason of the work stoppage and was at least a party in interest.
Finally, defendants question the power of the court to enjoin the Union from refusing to supply longshoremen to Dugan & McNamara, Inc. for stevedoring services at the sugar refining company's pier. Since the whole purpose of the collective bargaining agreement was to prevent a work stoppage a refusal by the Union to furnish its members for such services, thereby promoting such a stoppage, was certainly a violation of an obligation inferable from the whole tenor of the agreement.
For the reasons stated we were of opinion that the orders of the court below should be affirmed and accordingly we entered our order so holding.
DISSENTING OPINION BY MR. JUSTICE MUSMANNO:
Was the Court of Common Pleas of Philadelphia County empowered to issue an injunction against the defendants? I do not believe so. The subject matter of this litigation is interstate commerce and foreign commerce, which are exclusively matters for Federal jurisdiction. The pertinent tribunal here is the National Labor Relations Board. This, in a measure, was even recognized by plaintiffs. The Philadelphia Marine Trade Association, writing to the Chairman of the I.L.A. Committee on March 7, 1955, said: "In the absence of an agreement between the International Longshoremen's Association and the other union to arbitrate this dispute, the question of jurisdiction can be resolved only by the National Labor Relations Board."
The defendants have already charged the plaintiffs before the National Labor Relations Board with unfair labor practices in that the plaintiffs refused to *338 bargain in good faith with representatives of the employees in accordance with Section 11(d) of the Articles of Agreement. With such a charge pending, the State courts are ousted of jurisdiction. Mr. Chief Justice STERN, writing in the case of Garner v. Teamsters, C. & H., Loc. Union, 373 Pa. 19, 28, said: "It will thus be seen that the Labor Management Relations Act provided a complete remedy whenever there was a charge presented to it of an unfair labor practice,  immediate injunctive relief on petition of the Board, a final hearing by the Board, a review of such order in the Federal court. In our opinion such provisions for a comprehensive remedy precluded any State action by way of a different or additional remedy for the correction of the identical grievance."[*] In that case the Court of Common Pleas of Dauphin County had issued an injunction which prohibited the Teamsters Union from picketing the plaintiffs' place of business. This Court, reversing the lower court, said through the Chief Justice: "It is our opinion, therefore, since the plaintiff employers in the present case were engaged in interstate commerce, and the charge made by them was that the defendant Union was engaged in an activity which was unlawful under the law of the State but which also constituted an unfair labor practice under the provisions of the Labor-Management Relations Act, and since that act provides an adequate and complete administrative remedy to prevent the continuance of such activity if the charge be substantiated, the Court of Common Pleas of Dauphin County had no jurisdiction to issue an injunction in this case against the defendant. Plaintiffs' remedy must be sought by them in proceedings before the National Labor Relations Board, where an injunctive remedy, as previously *339 pointed out, is available." (p. 30) The decision of our Court was affirmed by the Supreme Court of the United States which said, through Mr. Justice JACKSON: "For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits." (Garner v. Teamsters Union, 346 U.S. 485, 500.)
The Supreme Court of the United States further approved the Garner case in its decision in the Weber v. Anheuser-Busch, Inc. case (handed down on March 28, 1955, 23 LW 4150) and specifically declared that: "A State may not enjoin under its own labor statute conduct which has been made an `unfair labor practice' under the federal statutes." In reviewing its decisions on the subject of Federal-State labor relations, the Court, speaking through Mr. Justice FRANKFURTER, said: "1. The Court has ruled that a State may not prohibit the exercise of rights which the federal Acts protect. Thus, in Hill v. Florida, 325 U.S. 538, the State enjoined a labor union from functioning until it had complied with certain statutory requirements. The injunction was invalidated on the ground that the Wagner Act included a `federally established right to collective bargaining' with which the injunction conflicted. International Union v. O'Brien, 339 U.S. 454, involved the strike-vote provisions of a state act which prohibited the calling of a strike until a specific statutory procedure had been followed. The state act was held to conflict not only with the procedure and other requirements of the Taft-Hartley strike provisions but also with the protection afforded by Sec. 7 of that Act. [footnote] In Amalgamated Association v. Wisconsin Employment Relations Board, 340 U.S. 383, the state court issued an injunction under a statute which made *340 it a misdemeanor to interrupt by strike any essential public utility services. It was held that the state statute was invalid in that it denied a right which Congress had guaranteed under Sec. 7 of the Taft-Hartley Act  the right to strike peacefully to enforce union demands for wages, hours and working conditions."
In the Annheuser-Busch case the respondent had filed a charge of unfair labor practice with the National Labor Relations Board and had obtained an injunction in the State Court. Although the Board ruled that no labor practice was involved, the Supreme Court held that the Board, and not the State court, was empowered to pass upon the issue, declaring: ". . . even if it were clear that no unfair labor practices were involved, it would not necessarily follow that the State was free to issue its injunction. If this conduct does not fall within the prohibitions of Sec. 8 of the Taft-Hartley Act, it may fall within the protection of Sec. 7, as concerted activity for the purpose of mutual aid or protection.
"Respondent itself alleged that the union conduct it was seeking to stop came within the prohibitions of the federal Act, and yet it disregarded the Board and obtained relief from a state court. It is perfectly clear that had respondent gone first to a federal court instead of the state court, the federal court would have declined jurisdiction, at least as to the unfair labor practices, on the ground that exclusive primary jurisdiction was in the Board. As pointed out in the Garner case, 346 U.S., at 491, the same considerations apply to the state courts."
It appears to me that the Majority Opinion has failed to give due weight to the decisions and the reasoning therein by the Federal courts on the subject before us. For instance, the celebrated Judge LEARNED HAND, in the case of International Brotherhood v. National *341 Labor Rel. Bd., 181 F. 2d. 34, 36, said in 1950 that: "It is now abundantly established that in the Labor Relations Acts Congress meant to exercise to the fullest extent its power over interstate commerce."
The Majority's interpretation of Section 301 of the Labor Management Relations Act, as I view it, does not accord with the Congressional intention behind that legislation. In the case of Fay v. American Cystoscope Makers, Ind., et al., U.S. Dist. Ct. S.D., N.Y., 98 F. Supp. 278, 281, the plaintiff, as president of a labor union, brought suit in a New York state court alleging that the defendant employer, and others, had breached a collective bargaining contract. The defendant employer removed the action to the Federal District court, and the plaintiff sought to have it remanded. In rejecting the plaintiff's motion, the Court, interpreting Section 301 of the Labor Management Relations Act, declared: "The suggestion that plaintiff should be permitted to compel defendant to litigate a federal claim in a state court when Congress has explicitly made available a federal forum is indefensible."
The Majority is not inclined to assign to Section 301 of the LMRA the vital role it should play in this case. The Majority would seem to regard it only as an alternative remedy or as merely a matter of procedural choice. In reality, however, it creates a very substantive right of which those engaged in interstate commerce cannot be deprived without denial of due process. In Schatte v. International Alliance, 182 F. 2d 158, 164, the United States Court of Appeals, Ninth Circuit, said: "Section 301 was not enacted merely to provide a new forum for the enforcement of contracts theretofore enforceable solely in the state courts. . . . the wording of the section and its place in the Taft-Hartley Act demonstrates that the section was designed to protect interstate and foreign commerce by *342 creating a new substantive liability, actionable in the federal courts, for the breach of a collective bargaining contract in an industry affecting interstate or foreign commerce."
In the case of Shirley-Herman Co. v. Internatl. Hod Carriers, Etc., 182 F. 2d 806, where a claim for damages had been filed because of an asserted violation of a collective bargaining agreement, the defendant union asserted that the New York law requires the plaintiff to show bad faith and that an action could be maintained only if all the members of the union were jointly or severally liable. The Court held this argument irrelevant: "This contention is meaningful only on the view that Sec. 301 of the Labor Management Relations Act, 29 U.S.C.A. Sec. 185, merely conferred jurisdiction upon the federal courts to entertain the action, and that the substantive principles of law to be applied must be those of New York. But Sec. 301 goes further than defendant conceives; it created a remedy where none existed before and provided a forum in which to enforce it."
In its opinion in this case the Majority relates what was omitted from the Labor Management Relations Act, but it is more important to consider what was retained. In the Shirley-Herman case the Court noted that: ". . . The report of the Senate Committee on Labor and Public Welfare, which considered this bill, noted that `to encourage the making of agreements and to promote industrial peace through faithful performance by the parties, collective agreements affecting interstate commerce should be enforceable in the Federal courts.'"
But the lower court here ignored not only the letter of the Labor Management Relations Act, but also its spirit which aims at promoting, as stated in the Shirley-Herman case, industrial peace through the *343 faithful performance of collective bargaining agreements affecting interstate commerce. An injunction is a violent measure that should only be utilized to prevent or repel a greater violence. It is for that reason that the Norris-LaGuardia Act and the Labor Anti-Injunction Acts have come close to completely outlawing injunctions in all labor disputes. Of course, Congress did enlarge, in the Labor-Management Relations Act, the scope of injunctive action where national security is involved, but it in no way lifted the bars against injunctions where a collective bargaining agreement was the subject of litigation. Since Federal legislation thus prohibits the Federal courts from issuing injunctions against employes in interstate commerce, it is not conceivable that State courts would have over interstate employes an injunctive jurisdiction which the United States courts do not possess.
The injunction in this case not only invaded the field of interstate commerce which is strictly Federal jurisdiction, but it went beyond even the provisions of the contract it was supposedly enforcing. Thus, it enjoined the defendants from refusing to supply men to the employers but the agreement is barren of any requirement that the Union supply men. Also, Sec. 206d of the Anti-Injunction Act excepts from its provisions "breach or violation of a valid subsisting labor agreement between an employer and . . . the employees," but the enjoining Court made the Philadelphia Marine Trade Association, which is not an employer, a beneficiary of the injunction. It also included, as a beneficiary, the National Sugar Refining Company which is not a party to the agreement at all.
The Majority cites in support of its position the cases of Alcoa Steamship Co., Inc. v. McMahon, 81 F. Supp. 541, Associated Telephone Co., Ltd. v. Communication Workers of America, C.I.O., 114 F. Supp. 334, *344 and Castle & Cooke Terminals, Ltd. v. Local 137 of International Longshoremen's and Warehousemen's Union, 110 F. Supp. 247. Apparently the glasses through which I read reveal a text different from that found by the Majority for I do not see in any of these cases authority for the statement: "That State courts retain the jurisdiction they have always had to enforce contracts notwithstanding Section 301 of the Labor-Management Relations has been held in several Federal cases," enumerating the ones just indicated. The Alcoa case decided that the plaintiff there, under the circumstances of that case, was not entitled to injunctive relief in the United States District Court. In the Associated Telephone Co. case Federal jurisdiction was refused because, inter alia, the plaintiff "had not alleged it was engaged in a business affecting interstate commerce." The Castle & Cooke case held that Congress "did not intend to change or remove the existing limitations on jurisdiction imposed by the Norris-LaGuardia Act to permit District Courts to hear injunction cases against labor organizations, even though they should arise out of violations of labor relations contracts." Holding that the Federal Court may not issue an injunction because of certain limitations is far from saying that the State courts have the power to grant injunctions where interstate commerce is involved. The question as to whether, where unfair labor practice is charged in interstate employment, as it is in the case at bar, the State is not ousted of jurisdiction because of the intercepting jurisdiction of the National Labor Relations Board, was not considered in any of the three cases cited by the Majority.

Offer to prove Violation of Agreement
At the trial in the court below the defendants attempted to show that the plaintiffs had themselves violated the Agreement and, therefore, under the provisions *345 of Pennsylvania's Labor Anti-Injunction Act of 1939 (43 PS Sec. 206d(a)), they were barred from obtaining an injunction. The record reveals the following: "MR. FREEDMAN: I offer to prove that the Philadelphia Marine Trade Association violated the agreement in locking out local 1291 of the ILA on several occasions during the period this contract has been in existence. THE COURT: But they have been working there ever since haven't they? MR. FREEDMAN: That is my offer of proof, sir. THE COURT: Up to the present inquiry they have been working. They have not been locked out now. They want them to go to work and they don't do it. MR. FREEDMAN: I am offering to prove that on several occasions during this past year  MR. RHOADS: I object. THE COURT: The objection is sustained. MR. FREEDMAN: Exception. THE COURT: I give you an exception, yes."
It will be noted here that when the attorney for the defendants sought to prove that the plaintiffs had violated the Agreement the Court interposed with a factual observation which was not warranted because, firstly, the hearing had not terminated and, secondly, the observation was not germane to counsel's offer. Mr. Freedman's offer came strictly within Section 206(d) of the Anti-Injunction Act which, in stating situations where injunctions may be entertained, specifically excepts: "Provided, however, That the complaining person has not, during the term of the said agreement, committed an act as defined in both of the aforesaid acts as an unfair labor practice or violated any of the terms of said agreement."
The Majority treats this serious matter almost as lightly as did the court below. The Majority says: "Defendants complain that the court refused to admit evidence designed to show that plaintiffs had violated the agreement on former occasions, but such evidence *346 would clearly have been irrelevant in view of the fact that the agreement admittedly had continued in full force and effect down to the time of the occurrences giving rise to the present litigation." The fact that the Agreement was in full force and effect had no bearing on the question whether the plaintiffs had violated its provisions. The Act specifically states that the plaintiffs are not entitled to an injunction if they themselves violate the agreement. Did the plaintiffs violate the agreement, or did they not? That was a question which the Chancellor was required to decide under the specific wording of the statute. If the plaintiffs could not show clean hands, they were not entitled to an injunction. The defendants claimed unclean hands. The lower court asserted and this Court affirmed irrelevancy. I believe the offer was most relevant, and, in view of the defendants' charges, it was imperative that the plaintiffs display their hands for inspection.

Negotiation and Arbitration
I cannot agree with the Majority's interpretation of the Agreement in litigation. Paragraph 11 (d) of that Agreement provides, inter alia: "In the event that technological advancements in machinery or methods in the future are introduced by the employers, the number of men thenceforth to be employed for handling the particular commodities shall be the subject of negotiation between the sub-committee herein created." This language of this provision is clear, unequivocal and conclusive. It cannot fall within Section 28 which states, inter alia: "The Impartial Arbitrator shall have unlimited authority in resolving any issues submitted to him, and shall likewise have unlimited authority to establish his own rules of procedure provided that he shall have no authority to change any of the terms or conditions of this agreement."[*] For the Arbitrator *347 to specify the number of men that are to be employed when technological advancements are involved is to run directly counter to Paragraph 11(d) which categorically states that the number of men to be employed for handling particular commodities is to be determined by the sub-committee through negotiation.
Negotiation and arbitration are obviously two different things and, as wishful as the plaintiffs might be, in desiring to see an arbitrator cleave with arbitrary ax through the whole bone of contention, they are nevertheless bound by the contract which they signed. The displacement of men by the introduction of new machinery is a serious problem which engages the furrowing thought of the wisest men of the era in the worlds of business, management, labor, economics and sociology. Humanity welcomes every invention which dries up the sweat of the working man and offers him a more leisurely hour in the sunshine of physical comfort and release from back-breaking toil. However, not every new rearrangement of electrons, pistons, valves, wheels and gears of itself necessarily advances mankind on the march to prosperity and happiness for all. What may be gained in one field of worthy desire may be lost in another.
Both management and labor recognize this sociological-scientific phenomenon and, accordingly, in many contracts, as is true in this case, it is agreed that when the technological giant appears, all persons concerned are to deliberate on whether his metallic cloak covers the heart of a Samaritan or a Frankenstein. Since management and labor are both seeking the same thing, namely, a profitable return on monetary and muscular investment, it is happily certain that with a genuinely sincere spirit of cooperation hovering over the table of negotiation, a mutually satisfactory accord can and must be achieved. This is the *348 intention embodied in Sec. 11(d) of the contract. Simple and unadorned as are the words in that section, they nonetheless breathe the spirit of the Golden Rule which can do more for justice than all the statutes and decrees promulgated since the days of Justinian. Neither party to the Agreement believed that so complicated, delicate and momentous a problem as unemployment through technology could be settled by a solitary arbitrator's intervention. Both apparently believed, and praiseworthily so, that a just and fair solution of the dilemma could be achieved through a patient and painstaking untying of the Gordian knot rather than a violent slashing through it, leaving numerous unravelling ends in the form of strikes, lockouts, business stagnation, melancholy and ruin.
A question similar to the one at bar arose in 1906 in the case of Henry v. Lehigh Valley Coal Co., 215 Pa. 449, 451. The contract there had to do with a mining operation and provided for arbitration in the event of differences between the parties. It also contained a clause which said that if a question arose as to the payment by the lessee of certain unmined coal, three mining engineers were to determine the amount of the coal on the property "by actual examination and testing of all the veins." In interpreting the contract, this Court declared that in spite of the general arbitration provision the special mining-engineer-examination clause provided for "a special tribunal to settle a special subject of dispute": "Notwithstanding, therefore, the generality of the language of clause 12 that any differences arising between the parties in reference to any matter relating to the agreement should be referred to three disinterested persons, it cannot be held to include a special subject of difference for which a different, special and peculiarly appropriate tribunal had been already provided."
*349 In a similar manner in the case at bar the parties agreed upon a special tribunal, a six-member committee, to negotiate the matter of all problems attendant upon technological improvements, excluding the arbitrator from this forum of dispute completely.
To allow the arbitrator here to determine the issue involved is to authorize him to alter the terms of the agreement; this, in the face of the specific prohibition in Article 28, to wit, "he shall have no authority to change any of the terms or conditions of this agreement."
It is by no means established procedure that the arbitrator must and will take over all issues arising in the interpretation of the technological provision in the contract. It was testified at the trial that in 1954 one of the plaintiffs, the Philadelphia Marine Trade Association, sought to utilize the arbitration services of Father Comey when the controversy involved the installation of what was known as a "slushing machine," an apparatus designed to empty ore from the hold of ships. Father Comey decided that the issue was not one for arbitration but one for negotiation and the matter was actually settled by negotiation.

The Chancellor's Attitude
It is commonplace to say that before a judge takes up the hearing of a cause he should, to the extent that it is humanly possible, put aside all preconceived notions on the merits of the controversy. The record here suggests that the Chancellor, instead of removing any coat of fixed impressions, donned several more as the trial progressed. His task was to ascertain whether the Agreement really required the defendants to arbitrate the differences between them and the plaintiffs. The Chancellor, however, assumed from the beginning that arbitration was imperative. Thus: "THE COURT: If the people involved were negotiating and they selected *350 their arbitrator, Father Comey, as the contract requires, the case would not be here. MR. FREEDMAN: I object to your Honor's statement `as the contract requires.' Your Honor has not even examined the contract. THE COURT: Well, the contract has just been read to me that where there is a dispute, they have to present it to some grievance committee and when they cannot agree, they have to submit the matter in dispute to Father Comey. Isn't that the situation?"
Also: "THE COURT: Go ahead. These people should be down there working and earning a living. MR. FREEDMAN: And I take exception to your Honor's remarks and I again ask that you disqualify yourself from hearing this case because that is further evidence that you have already prejudged the case. THE COURT: Not at all. You have an agreement there that Father Comey is your arbitrator and you just ignore it. MR. FREEDMAN: I again object to that and ask that you disqualify yourself, again because it indicates that you are prejudging the case. THE COURT: Not at all."
The Chancellor's treatment of defendants' counsel was as unfortunate as it was uncalled-for. For instance, he charged the defendants' lawyer with misleading the defendants. This is a serious imputation and cannot be supported by the record. There is nothing in the testimony to even remotely suggest that Mr. Freedman was doing other than properly protecting the interests of those he was ably representing. I see no justification for the Court's animadversions reflected in the following: "THE COURT: I think these people are being very badly misled. MR. FREEDMAN: And I again ask your Honor to disqualify yourself. THE COURT: No, no. MR. FREEDMAN: And I object to your Honor's statement. THE COURT: You can object to it all you want. That is as plain as the nose on anybody's face. MR. FREEDMAN: Your Honor knows, and *351 you asked me the question before  THE COURT: You would serve your clients better if you would tell them to abide by their agreement and go to Father Comey  MR. FREEDMAN: Your Honor knows  THE COURT: Let me finish. Go to Father Comey and submit their argument to him  and he may decide in their favor  instead of making a court case out of it. MR. FREEDMAN: I object to your Honor telling me what to do. I have a right to use my own judgment and I ask your Honor to limit your consideration to this case. THE COURT: I am not telling you what to do. MR. FREEDMAN: You just did. THE COURT: I am telling you that these litigants would be better off if they would abide by their agreement."
With equal disregard for the respect due all members of the Bar, the Chancellor charged counsel with trying to "find ways and means and loopholes" to avoid an obligation: "THE COURT: Look here, you have better sense than that. What is the purpose of putting in the agreement the provision about submitting all matters in dispute to Father Comey? The very purpose is to try to keep disputes out of the courts. MR. FREEDMAN: Well, your Honor knows  THE COURT: Wait a minute. Let me finish. It seems to me that you are trying to find ways and means and loopholes to get out of it. MR. FREEDMAN: I object to your Honor's statement  THE COURT: You can object to it, but that is my opinion. MR. FREEDMAN: It again indicates your Honor's frame of mind. THE COURT: Not at all. I remember the last litigation and that is exactly what you are trying to do."
Although it is difficult to believe that the Chancellor would deliberately close his ears to legitimate argument in a case, yet the record here shows that the Chancellor declared he would refuse to listen: "BY MR. FREEDMAN: Q. Did not the Philadelphia Marine Trade *352 Association from time to time during the past year refuse to give employment to the longshoremen members of Local 1291, this union, and all other members of the International Longshoremen's Association? MR. RHOADS: I object to that. It is the same question. THE COURT: The objection is sustained. There was a right to go to Father Comey and get redress, if necessary. MR. FREEDMAN: I take exception to your Honor's remarks. THE COURT: Well, your question certainly is not pertinent here. MR. FREEDMAN: If your Honor will listen to me, perhaps you will change your mind. THE COURT: I will not listen. You put your questions to him."
It appears to me, as the above illustrations would indicate, that the defendants failed to receive the impartial hearing to which they were entitled under our Constitution, the laws of the land and all traditions of fairness and undeviating impartiality which govern proceedings in our courts. Every lawyer has the right to be treated with courtesy, listened to with attention and replied to with deliberation. As I read the record, the Trial Judge here failed to observe these tenets and, for that reason, added to what I have further observed on the various questions involved, I would reverse.
NOTES
[*] Italics throughout, mine.
[*] All italics, mine.