BULL-INSULAR LINE, INC., Libelant,

v.

NATIONAL SUGAR REFINING COMPANY, Respondent.

NATIONAL SUGAR REFINING COMPANY, Cross-Libelant,

v.

BULL-INSULAR LINE, INC., Cross-Respondent.

No. 229 of 1955.

United States District Court
E. D. Pennsylvania.
Jan. 26, 1960.

Clement C. Rinehart, Kirlin, Campbell and Keating, New York, N. Y., and Harrison G. Kildare, Rawle & Henderson, Philadelphia, Pa., for libelant.

Owen B. Rhoads, Philadelphia, Pa., for respondent.

GRIM, District Judge.

The principal question in this case is whether the expense of holding a loaded ship at her discharging berth, where a longshoremen's strike prevents unloading, must be borne by libelant, the carrier, or respondent, the consignee.

Libelant, a common carrier by water in interstate commerce,[1] carried on its chartered steamship Arizpa a full cargo of raw sugar in bags from Puerto Rico to respondent's pier, adjacent to its refinery, in Philadelphia. Unloading of the Arizpa was delayed almost 43 days by a longshoremen's strike. In this action libelant's principal claim is for demurrage at $1,700 per day for the period of the delay. The rate was fixed in the pertinent tariff, which, with the bills of lading and the Warshipsugar form of charter party, set forth the rights and liabilities of the parties. Respondent denies all liability for demurrage.

The longshoremen's strike came about as a result of a change in the method of handling sugar cargoes at respondent's pier.

At that pier prior to the Arizpa's arrival ships were unloaded by the jitney method: bags of sugar were placed in slings in the ship's hold, from where the slingloads of bags were picked up by the ship's tackle and lowered onto the pier alongside the ship. Then the slingloads were taken by electric trucks or jitneys over a scale and to more distant places on the pier within the pier shed. Up to this point all the work was done by longshoremen. From this point the bags were handled and taken into the refinery by respondent's employees who were not longshoremen.

In the spring of 1954 respondent started work on a labor-saving device which would lower the cost of moving the sugar from where it landed alongside the ship by using fewer longshoremen than the jitney method required. The labor-saving device was an overhead monorail system, which was to pick up the slingloads of sugar from the pier alongside the ship and carry them to the places on the pier to which they had formerly been carried by the jitneys. Under the jitney system 163 longshoremen were required to move the bags of sugar from the ship's hold to the place on the pier alongside the ship and from there to the more distant places on the pier. Under the monorail system respondent proposed to do the same job with the use of only 108 longshoremen.

While the monorail system was being built on respondent's pier, Local 1291 of the International Longshoremen's Association, the representative of the longshoremen who worked on respondent's pier, knew of the proposed labor-saving device and viewed it with apprehension, since it threatened the elimination of a number of jobs of the Local's members.

The monorail system was completed just before the Arizpa's arrival, and the Arizpa was the first ship for which the monorail system was to be used. Unhappily for libelant, which had no direct

---

1. This term applies to water transportation between one state, territory, district, or possession, and another: 46 U.S. C.A. § 801.

concern with labor problems in Philadelphia, the discharge of the Arizpa would serve as the test to determine how the apprehensive longshoremen would react to the new labor-saving device.

The Arizpa arrived, as scheduled, on the afternoon of March 21, 1955. Its unloading should have started at eight o'clock on the morning of March 22, 1955. Shortly before eight o'clock on that morning some 170 longshoremen appeared outside respondent's pier, but refused to unload the ship because of the proposed reduction in the working force. Thus started a bitter longshoremen's strike which lasted for 43 days, and which, despite a court injunction and a contempt order against the union, ended only because all the members of the Philadelphia Marine Trade Association refused to hire any longshoremen until the strike was settled.

Respondent did not directly employ any longshoremen for unloading. The longshoremen who did the unloading were employed by a stevedoring contractor, Dugan & McNamara, Inc.[2] The stevedoring contractor was a member of the Philadelphia Marine Trade Association, which on behalf of its members negotiated collective bargaining agreements with longshoremen's unions in the port of Philadelphia, and which attempted to settle controversies with the unions under the collective bargaining agreements which it had negotiated.[3] When the dispute arose over the reduction of the number of longshoremen on respondent's pier, the Philadelphia Marine Trade Association took the position that the dispute was subject to arbitration under the collective bargaining agreement, and that under its terms the dispute had to be settled by arbitration, and that the agreement prohibited a strike in reference to

the disputed question of the reduction in the work force. The union contended that the controversy was of a type not subject to arbitration and that the no-strike provision of the agreement did not apply to this situation. The union's contentions were decided against it: Philadelphia Marine Trade Association v. International Longshoremen's Association, 1955, 382 Pa. 326, 115 A.2d 733, certiorari denied 350 U.S. 843, 76 S.Ct. 84, 100 L.Ed. 751.

Respondent's denial of liability for demurrage is based upon the tariff's strike clause:

"Laytime for discharging shall be suspended and no demurrage shall accrue during any period in which discharging is prevented by a strike or riot of any labor employed by the Owner or any of the Owner's agents or contractors (including labor employed by the Consignee or Receiver of the Vessel's cargo solely for the purpose of performing a stevedoring contract with the Owner) * * *"

Respondent contends that the longshoremen who moved the sugar from the ship's hold to the distant points on the pier and who went on strike when the monorail system was to begin operation were, in the words of the strike clause, "labor employed by the Consignee * * solely for the purpose of performing a stevedoring contract with the Owner." Because of this, respondent contends, the strike clause operated to relieve respondent from liability for demurrage.

Respondent contends that the longshoremen were employed solely to perform a stevedoring contract with the Owner (libelant) and bases its contention on the claim that all the work the longshoremen were doing was work that libel-

2. Under the tariff the consignee selected the stevedoring contractor for unloading, but the carrier made an allowance to the consignee for part of the stevedoring expense.

3. This situation is complex and unique in that there is a train of contracts. Performance of the contract of carriage be-

tween A, libelant, and B, respondent, was prevented not by a breach of the contract between A and B, nor by breach of the stevedoring contract between B and C, the stevedoring contractor, but rather by breach of the collective bargaining agreement between D, bargaining representative of C, and E, collective bargaining unit of C's employees.

ant was under a legal duty to perform. This contention rests in turn upon the contention that libelant was under a legal duty to lift the cargo not only out of the hold and onto the pier, but also to carry the cargo thence to more distant places on the pier. The applicable tariff provision is:

> "The Owner shall discharge, and the Consignee shall receive, the cargo alongside the vessel within reach of her tackle, or in accordance with the custom and usages of the port of discharge."

Obviously this tariff provision required libelant to unload the cargo alongside the vessel within reach of her tackle, but did libelant have the further obligation to carry that cargo to the more distant places on the pier? Respondent contends that there is a custom in the port of Philadelphia which obliges the carrier to discharge at a point beyond the reach of ship's tackle and that the custom applies to libelant in accordance with the tariff provision.[4]

Respondent has asserted the custom in its answer as an affirmative defense and has the burden, therefore, of establishing it.

Respondent's evidence shows that there have been three piers in Philadelphia owned or operated by sugar refiners,[5] and that on each of these piers cargoes of raw sugar in bags were moved by a single crew of longshoremen uninterruptedly from the ship's hold all the way to the distant points on the pier. Respondent also showed that other packaged dry cargoes were moved in the same way to distant points on other piers in Philadelphia. It is this evidence—that on occasions a single crew of longshoremen has carried bagged sugar or other dry cargo from ship's hold to distant points on the pier—that respondent relies on to prove that there is a custom in the port of Philadelphia by which carriers

discharge cargoes at points on the pier beyond the reach of ship's tackle. Respondent's evidence, however, does not prove this.

The discharge of cargo is not so simple a thing that a custom in reference to the point of discharge, and consequently the duty of a carrier, under a tariff which refers to custom, to bring the cargo to that point, can be determined merely by a showing that a single crew of longshoremen moved the cargo from the ship to a particular point on the pier.

Respondent's evidence on custom does not establish whether the longshoremen were employed directly by the ship or the consignee, or whether, in fact, they were employed by a stevedoring contractor. Conceivably the longshoremen might have been employed by any one of the three. Conceivably, too, the stevedoring contractor might have been employed by the carrier for the consignee or by the consignee for the carrier. Respondent's evidence also fails to establish whether the services of the longshoremen, whether they were employed directly or through a stevedoring contractor, were to be paid for by the party which employed these services. Conceivably the party which employed them, carrier or consignee, might be reimbursed in whole or in part by the other. Respondent's evidence has also failed to show who it was, as between carrier and consignee, who ultimately bore the expense of moving the cargo from the hold to the distant points on the pier, or whether (and if so in what proportion) the cost was shared between them. A point that tells very strongly against the contention that custom obliged the carrier to carry the cargo to distant places on respondent's pier is respondent's installation of the monorail system in an attempt to reduce the cost of carrying the cargo from ship's side to the distant places on its pier. If the cost of carrying the cargo to those places had been a cost

---

4. There was testimony indicating that this provision was inserted to apply only to Gulf ports, but the words do not so restrict its meaning.

5. One of which was respondent's pier, involved in this case.

to be borne entirely by the carrier under a local custom, respondent as a consignee would have had absolutely no concern with it, and would not have undertaken the expense of installing the monorail system or risked the longshoremen's strike which followed.

During cross-examination, respondent's counsel had one of libelant's witnesses read into the record excerpts from a series of eight contracts made between libelant and Jarka Corporation, a stevedoring contractor, between 1947 and 1955, dealing with the discharge of refined or partly-refined bagged sugar at Philadelphia. The excerpts indicated that the work libelant contracted for was the movement of cargoes of such sugar from ship's hold to railroad cars or other distant points on the pier. These contracts showed that the ship in these instances was to pay the stevedoring contractor for this work, but again the evidence falls short of showing whether the consignee was to reimburse the carrier for part or all of the work. Moreover, there was no showing of the number of cargoes moved by the parties to the contract in the port of Philadelphia during this eight-year period, by which it might be determined whether there were enough instances to establish the existence of a custom. The very fact that there were contracts covering discharge is some indication that the problem is one of contract or tariff in each case, rather than one of custom.

Indeed, unless the evidence were clear and strong, it would be difficult to believe that there is in the port of Philadelphia a custom requiring a ship to move her cargo farther on dry land and on the consignee's premises than she is required to move it at other ports for the same amount of money.[6] In the present case

it is clear that while the carrier had to reimburse the consignee for stevedoring expense, it was only for the expense of carrying the cargo to a point within reach of ship's tackle and no farther.[7] This is one specific instance in which the carrier is not obliged to pay for moving the cargo beyond the end of ship's tackle, and is a not inconsiderable indication that respondent is in error in contending that custom requires the carrier to discharge to distant points on the pier and to pay for discharge to those points.

■ In view of the failure of respondent's evidence to establish that custom made it the obligation of a carrier to pay for the longshoremen's work of carrying a cargo to the distant points on a pier, no finding can be made that there was in the port of Philadelphia a custom which required carriers to discharge at the distant points rather than at the ship's side within reach of her tackle. Since respondent has failed to establish a custom obliging the ship to discharge her cargo at a point beyond the end of her tackle, the contention that the longshoremen were doing only ship's work falls. It must be remembered that the consignee paid for moving the cargo from the ship's side to the distant places on the pier.[8] This by itself is a strong indication that the longshoremen were not "labor employed by the Consignee * * * solely for the purpose of performing a stevedoring contract with the Owner." Since the longshoremen were not doing work which was the sole responsibility of the ship, respondent's contention that the strike clause stopped the running of demurrage also falls. *Respondent is liable, therefore, for demurrage.*

■ With respect to the holding of the ship at the pier, libelant has proved, as

6. The tariff rate was the same for Boston, New York, Philadelphia, and Baltimore.

7. While in this case the allowance appears to have been greatly in excess of the cost of moving the cargo to the end of ship's tackle, the evidence is clear that any work beyond that point "was not taken into consideration at the computation in com-

puting the allowance to be accorded for discharge." N. T. 466.

8. As has been pointed out, the ship made an allowance to the consignee for the cost of moving the cargo from the hold to a point within reach of ship's tackle, but not farther. From this point the consignee had to bear the cost of moving the cargo.

charterer of the ship, actual damages in excess of the amount of demurrage at the tariff rate. Libelant contends that it should be permitted to recover its full actual damage. This will be denied. Demurrage is the detention damage fixed by the tariff, and common carriers by water are forbidden to receive a greater compensation than the rates specified in the tariff, 46 U.S.C.A. § 844.

There is a further dispute between the parties with respect to 6,199 pounds of "'sweepings'": sugar which becomes contaminated by being spilled on the ship and the dock out of damaged bags. It is swept up, along with the dirt it may fall in, and put into other bags, distinctively marked. It has value to sugar refiners. Libelant seeks to recover the freight on the 6,199 pounds of sweepings, and respondent claims a deduction for that amount of sugar "short-landed", i. e., loaded on libelant's ship in Puerto Rico but not delivered to respondent in Philadelphia.

The sweepings figure was based on a schedule created under some agreement between buyers and sellers of sugar.[9] While an agreement on sweepings may exist between buyers and sellers of sugar, the evidence in this record fails to establish that it does. Further, there is no evidence whatever in the record that the agreement, if it does exist, is in any way binding on libelant, a carrier. The question of the validity of an agreement affecting the amount of freight payable, in the light of 46 U.S.C.A. § 844, need not be considered.

Libelant is entitled, therefore, to the freight for the 6,199 pounds of sweepings, and respondent is not entitled to any deduction for shortage in respect of these sweepings. The stevedoring allowance due respondent is to be determined without any deduction based on an allowance for sweepings.

Respondent claims wharfage[10] at the rate of $91.38 per day for the 54 days the ship lay at the pier. Libelant contends that it is liable for wharfage only during the period of actual unloading, but is relieved from payment of wharfage for the balance of the period (in substance, the period of the strike). The tariff provides:

"The Owner shall pay wharfage (dockage) on the Vessel at a rate not exceeding the established rate. The Vessel shall leave discharging berth as soon as possible, after completing discharge of cargo, weather and tide permitting."

The tariff contains no provision relieving the owner from payment of wharfage in the event of a strike, or, in fact, in the event of delay resulting from whatever cause. As we have seen, the tariff provides explicitly for the effect of a strike on demurrage. The omission to make similar provision as to wharfage appears thus to have been intentional. For this reason respondent is entitled to wharfage for the actual time the Arizpa lay at its pier.

Respondent consignee makes the further contention that there was a duty on libelant, who knew of the likelihood of a strike and that the ship might be detained in consequence, to have diverted the ship, before it docked, "to some other discharging point." The tariff provides that:

"The Consignee shall designate, and the Vessel shall discharge at discharging berth * * *"

Respondent, having insisted that the Arizpa proceed to respondent's Philadelphia pier despite libelant's request on March 19, 1955, that the ship proceed to some other port, is not entitled to be relieved of liability for libelant's failure to divert.

Libelant is directed to submit an order for judgment in conformity with this opinion and the findings of fact and conclusions of law which are filed herewith.

9. Sweepings totaled 1,466 bags weighing 239,948 pounds. The allowance on this quantity was calculated to be 6,199 pounds.

10. The charge to which vessels are liable for use of a dock for furnishing, supplying, loading, unloading, and repairing. 1 Benedict on Admiralty, 309.